# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ANTHONY G. BROWN, <br> Attorney General of Maryland, <br><br> *Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. _____ |

## **COMPLAINT**

Plaintiff the National Shooting Sports Foundation, Inc. ("Plaintiff" or "NSSF") brings this Complaint against Anthony G. Brown, in his official capacity as Attorney General of Maryland. NSSF brings this Complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.     This lawsuit challenges the constitutionality of Maryland's "public nuisance" statute, which is specifically designed to evade the judgment of Congress—and the Constitution.

2.     On May 16, 2024, Maryland Governor Wes Moore signed into law House Bill 947 ("HB947"), which radically redefines the tort of "public nuisance" in Maryland as it applies to members of the firearm industry.  Under HB947, the lawful and constitutionally protected "sale, manufacture, distribution, importation, or marketing of a firearm-related product" may be deemed to violate Maryland law and justify the imposition of sweeping liability if a judge or jury later finds that such conduct "knowingly create[d], maintain[ed], or contribute[d] to harm to the public." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a).

3.     HB947 is breathtaking in its scope.  Although application of the statute is triggered by criminal misuse of a firearm, HB947 does not regulate the use of firearms.  Nor does HB947 impose liability on individuals who criminally misuse firearms to the detriment of themselves or others.   Instead, the statute regulates selling, manufacturing, and advertising legal (and constitutionally protected) firearms and related products.  In other words, HB947 regulates commerce in and speech relating to arms—even when it takes place outside of Maryland, as will often be the case.  The statute also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  For instance, speech-based torts traditionally require proof of reliance.  Yet HB947 not only does away with that bedrock requirement, but allows judges and juries to impose liability based on truthful,

non-misleading speech about legal products.

4.      None of that is consistent with the Constitution.  The Commerce Clause prohibits states from regulating commerce (selling, manufacturing, marketing, etc.) that takes place beyond their borders, even when it has effects within the state.  The First Amendment prohibits states from punishing wide swaths of truthful speech about legal products, even if the products are dangerous or the speech is unpopular.  The Second Amendment protects commerce in arms.  And the Due Process Clause prohibits states from punishing one private party for the conduct of another.

5.      All of that is reason enough to invalidate Maryland's new statute.  But there is an even more glaring problem with HB947:  It runs head-on into a federal statute.  In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of lawful firearms and ammunition when third parties misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§7901-03, in 2005.  The PLCAA expressly prohibits state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  *Id.* §7903(5)(A).

6.      Maryland enacted HB947 to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate, making HB947 entirely inconsistent with the protections afforded by Congress and the Constitution.

7.      Indeed, the Attorney General has already begun initiating lawsuits against industry

members under HB947 seeking to hold them responsible for the criminal misuse of their products by third parties. Just this past month, for example, he and the Baltimore City Solicitor brought a lawsuit against NSSF member Glock, Inc. ("Glock"), seeking not only to permanently enjoin the sale of one of the most popular pistols in the country, but to hold Glock responsible for the criminal acts of third parties who have unlawfully converted those legal pistols into illegal machineguns.

8.      That lawsuit—along with several others raising similar theories of liability against firearm industry members, *see infra* ¶¶38-48—makes further targeting of NSSF members all but inevitable, as several members sell, distribute, and market the very Glock pistols that the Maryland Attorney General has sought to ban through its lawsuit against Glock under HB947. Some members also manufacture, sell, distribute, and market pistols inspired by Glock's design, as well as AR-15 style firearms, both of which can also be illegally converted into machineguns. Still other members manufacture, sell, distribute, and market in neighboring states firearms and magazines that are banned in Maryland, creating a serious risk that they will be haled into court if anyone unlawfully brings those firearms magazines into New Jersey and uses them to commit a crime there. Members could guard against the risk of such lawsuits only by ceasing to sell, distribute, or market these lawful products altogether—at substantial loss to their businesses. And there may not even be a feasible way to guard against some of the risks that HB947 imposes.

9.      There should be no doubt that the Attorney General plans to deploy HB947 as a powerful new weapon in his arsenal not only to wage lawfare against NSSF's members just for engaging in lawful commerce in arms, but to hold them liable for the unlawful acts of third parties who misuse their legal products to commit heinous crimes. In other words, he intends to deploy HB947 to accomplish precisely what the PLCAA and the Constitution prohibit.

10.      For these reasons and those set forth below, NSSF seeks a declaration that HB947

is preempted and unconstitutional and an injunction preventing the Attorney General and those acting in concert with him from enforcing the statute against NSSF or its members.

## THE PARTIES

11.    NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.

12.    NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.

13.    NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under HB947 not only for members, but for their employees and agents as well.

14.    NSSF is authorized by its board of directors to bring this action on its members' behalf.

15.    Defendant Anthony G. Brown is the Attorney General of Maryland, the chief law enforcement officer of the State of Maryland.  Attorney General Brown is sued in his official capacity.  At all relevant times, Attorney General Brown, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## BACKGROUND

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions That Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

16.    The Constitution "confer[s] an individual right to keep and bear arms."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 20 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend. II.  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

17.    Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals."   15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including:  strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Dist. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta, U.S.A., Corp.*, 847 A.2d 1127, 1131 (D.C. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 367 F.3d 1252, 1252-53 (11th Cir. 2004) (per curiam); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

18.    Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in allowing one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J.

Super. Ct. App. Div. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003). Others were unsuccessful. *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

19.    But the final tally told only part of the story. Had these sprawling suits been permitted to persist and proliferate, the legal fees alone would have bankrupted the industry. That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearm[] industry." Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

20.    It did not take long for Congress to recognize these lawsuits for what they were: a coordinated effort to try to destroy the firearm industry by saddling it with liability for the acts of criminals. States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state. 15 U.S.C. §7901(a)(7)-(8). They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7). And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended." *Id.* §7901(a)(5).

21.    Congress enacted the PLCAA to put an end to such state-law actions. Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade

associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties. *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

22.    The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court." *Id.* §7902(a).  The PLCAA preempts "civil action[s] … brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

23.    Only six enumerated types of claims are not so prohibited. *See id.* §7903(5)(A). These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, breach of contract or warranty, or violation of a statutory or regulatory requirement specific to the sale or manufacture of arms.

24.    None of the enumerated exceptions extends to state laws that authorize imposition of liability against manufacturers and sellers of firearms and ammunition for alleged "public nuisance" caused by the criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to— and does—stamp out. *See id.* §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540-41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented[.]").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

25.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearm industry.

26.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' power under the Commerce Clause, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 172-73 (D.C. 2008); *City of New York*, 524 F.3d at 395-96; comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of New York*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 764-65; and does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of New York*, 524 F.3d at 397-98.

27.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions. Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions. For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from the criminal … misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury. *Delana*, 486 S.W.3d at 321. The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action. *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021). And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death,

nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii). *City of New York*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

28.     Most recently, the Pennsylvania Supreme Court unanimously rejected a Pennsylvania plaintiff's attempt to circumvent the PLCAA, holding that the PLCAA embodies "a valid exercise of Congress's Commerce Clause authority and does not violate the Tenth Amendment or principles of federalism" and that it "operates to bar" plaintiff's state law products liability claims against a firearm manufacturer's lawful commerce. *Gustafson v. Springfield, Inc.*, --- A.3d --- , 2025 WL 955641, at *22 (Pa. Mar. 31, 2025).

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

29.     In the decades since the PLCAA was enacted, the Supreme Court has repeatedly made clear that the Second Amendment protects an individual and fundamental right. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 690 (2024); *Bruen*, 597 U.S. at 17; *McDonald v. Chicago*, 561 U.S. 742, 749-50, 778 (2010); *Heller*, 554 U.S. at 592. The Court has further confirmed that the right "to keep and bear Arms" protects the right to keep and bear arms both inside and outside the house. *See Bruen*, 597 U.S. at 70-71. And in doing so, the Court has made clear that when the government seeks to restrict the exercise of Second Amendment rights, the government bears the burden of proving that its law is "consistent with this Nation's historical tradition" of regulating firearms. *Id.* at 17-31; *see also Rahimi*, 602 U.S. at 691.

30.     All of these cases should have prompted states to reconsider their laws to ensure that they are sufficiently protective of rights the Supreme Court has repeatedly reaffirmed are fundamental. Unfortunately, they have repeatedly prompted the opposite reaction in certain states. Almost immediately after *Bruen* was decided, some of the same very few states that had endeavored to prevent their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten

Island Live (July 9, 2022), https://bit.ly/3Q8l2K0.  While some of those efforts are novel, others are re-runs.  In particular, nine states (beginning with New York, the state whose restrictive carry regime *Bruen* invalidated) have passed laws purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago.  *See* Cal. Civ. Code §3273.51; Colo. Rev. Stat. §6-27-104; 10 Del. Code §3930; Haw. Rev. Stat. §134-102(b)(2); 815 Ill. Comp. Stat. 505/2DDDD; Md. Code Ann., Cts. & Jud. Proc. §3-2502; N.J. Stat. Ann. §2C:58-35(a); N.Y. Gen. Bus. Law §898-b- to -c; Wash. Rev. Code §7.48.330.

**Maryland's House Bill 947 Authorizes Exactly the Sort of Sprawling Tort Actions that Congress Passed the PLCAA to Prohibit.**

31.    Maryland recently joined that inauspicious effort.  On May 16, 2024, the Governor of Maryland signed into law House Bill 947, titled "An Act concerning Civil Actions – Public Nuisances – Firearm Industry Members (Gun Industry Accountability Act of 2024)."

32.    HB947 is fundamentally inconsistent with the PLCAA.  The statute not only declares Maryland's intention to address legal "firearm-related products" and lawful commerce in legal products, Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(b), but purports to chart a way around federal law by codifying the very sort of novel tort theories that the PLCAA forbids.  *But see Ileto*, 565 F.3d at 1136 ("[T]he text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action.").

33.    HB947 creates a new cause of action for public nuisance, which applies only to "firearm industry member[s]," i.e., those "engaged in the sale, manufacture, distribution, importation, or marketing of a firearm-related product."  Md. Code Ann., Cts. & Jud. Proc. §3-

2501(c).

34.    This new cause of action is sweeping.  A "firearm industry member" may be held liable for "the sale, manufacture, distribution, importation, or marketing of a firearm-related product," even if that conduct was fully lawful where it occurred and fully compliant with federal law, if it later is deemed to have "knowingly create[d], maintain[ed], or contribute[d] to harm to the public," *id.* §3-2502(a)—a concept that HB947 leaves undefined.  Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("sale, manufacture, distribution, importation … of a firearm-related product") thus may be the basis of a tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in Maryland.

35.    And the law does not stop there.  "A firearm industry member" may also be held liable under HB947 for failing to "establish and implement reasonable controls regarding the sale, manufacture, distribution, importation, marketing, possession, and use of … firearm-related products," *id.* §3-2502(b), even if the relevant product was not "[s]old, manufactured, distributed, imported, or marketed" in Maryland, *id.* §3-2501(d)(2) (defining "[f]irearm-related product").

36.    Making matters worse, the statute does not key "reasonable controls" solely to the many federal, state, and local laws and regulations with which firearms manufacturers and sellers must already comply.  Nor does it identify what controls beyond compliance with those laws and regulations are or are not "reasonable."  Instead, HB947 lays out what these unidentified "controls" are supposed to accomplish:

(1)  To prevent the sale or distribution of a firearm-related product to:

   (i)  A straw purchaser;

   (ii) A firearm trafficker;

   (iii) A person prohibited from possessing a firearm under State or federal law; and

   (iv) A person who the firearm industry member has reasonable cause to believe intends to use the firearm-related product:

    1. To commit a crime; or

    2. To cause harm to the person or another person;

  (2) To prevent the loss or theft of a firearm-related product from a firearm industry member; and

  (3) To ensure that the firearm industry member complies with all provisions of State and federal law and does not otherwise promote the unlawful sale, manufacture, alteration, importation, marketing, possession, or use of a firearm-related product.

*Id.* §3-2501(f).  In other words, "reasonable controls" are all "[r]easonable … policies" that will achieve goals as sweeping and abstract as preventing crime generally and complying with all federal and state law.  The failure to implement any one of the potentially infinite and unnamed procedures that might help achieve those goals likewise is a "public nuisance."  *Id.* §3-2502(c).

  37. The broad language of HB947 expands the scope of public nuisance law in other unprecedented ways as well.  Most notable, the statute rewrites the definition of proximate cause to mean something other than proximate cause.  Under HB947, the conduct of a firearm industry member is deemed to constitute a "public nuisance" if the "harm to the public" was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties.  *Id.* §§3-2501(f), 3-2502(a), (c).  *But see Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 642 A.2d 219, 231 (Md. 1994) ("[The proximate cause] must be the natural and probable consequence of the negligent act, *unbroken by any intervening agency*[.]" (emphasis added, brackets in original)).  What is more, the statute explicitly eliminates the need to prove intent:  Liability may attach under HB947 without regard to whether the "firearm industry member acted with the intent to violate this subtitle."  Md. Code Ann., Cts. & Jud. Proc. §3-2503(b).

  38. HB947 authorizes "the Attorney General, a county attorney, or the Baltimore City

Solicitor" to bring suit seeking "[r]estitution;" "[c]ompensatory and punitive damages;" and "[r]easonable attorneys' fees and costs." *Id.* §3-2503(a). The Attorney General, county attorneys, or the Baltimore City Solicitor may also seek "[i]njunctive relief," *id.*, prohibiting the firearm industry member from continuing the conduct that gave rise to the purported nuisance—even if the relevant conduct occurred out of state, is protected by the Constitution, and/or is necessary to ensure that law-abiding citizens can exercise their constitutional rights.

**After Enacting HB947, Maryland Promptly Begins Prosecuting Industry Members for Harms Caused by Third Parties.**

39.     The Attorney General has not been shy about utilizing HB497. Less than a year after the law was enacted, the Attorney General partnered with the Baltimore City Solicitor to file a lawsuit in the Circuit Court of Maryland against NSSF member Glock seeking to use HB947 to enjoin Glock from selling an entire line of popular pistols that are legal to sell, buy, and use in Maryland—and every other state in the country. *See* Compl., *Mayor of Balt. v. Glock, Inc.*, No. C-24-CV-25-001450 (Md. Cir. Ct. Feb. 12, 2025) ("*Glock* Compl."). Simply because Glock is aware that some third parties have illegally converted its lawful pistols into machineguns using an illegal machinegun conversion device, Maryland makes the exceedingly strained claim that Glock "promot[es] the proliferation of illegal machine guns in Baltimore and Maryland," and thereby "knowingly creates, maintains, and contributes to harm in Baltimore and Maryland that harms the safety and health of the public, including the youth," in violation of HB947. *Id.* ¶114; *see id.* ¶1-16, 105-21.

40.     Not content with trying to bar the lawful sale of legal (and constitutionally protected) pistols, the Attorney General also seeks untold sums in abatement and restitution, owing to injuries caused by the third parties who illegally convert their Glock pistols into machineguns and then use them to commit crimes in Maryland. *Id.* at 50; *see also id.* ¶¶9, 59, 95-99 (seeking

to hold Glock liable for "carjackings, illegal drug sales, traffic violations, and violent crimes").

41.    As Maryland's lawsuit against Glock makes plain, the Attorney General plans to weaponize HB947 to prosecute NSSF members for engaging in lawful commerce, and to try to hold them responsible for injuries caused by the criminal acts of third parties who are outside their control.  There can be no doubt, then, that NSSF members now face a concrete threat of being sued under HB947 just for lawfully manufacturing, marketing, and selling legal firearms.

42.    That is especially true because numerous NSSF members currently market and sell Glock firearms across the country, including in Maryland.  Many of them also manufacture, market, distribute, and sell AR-15 style firearms, which too can be (illegally) equipped with an illegal machine gun conversion device and used (illegally) for nefarious ends, thus further increasing the risk that NSSF members will be sued under HB947.

43.    Unfortunately, Maryland's recent lawsuit seeking recompense from a licensed industry member for the crimes of third parties is consistent with a growing trend among states that have enacted similar legislation designed to override the PLCAA's protections (and the Constitution).

44.    Various other states and local governments have sought to use laws like HB947 to hold members of the firearm industry responsible for the criminal conduct of third parties beyond their control.

45.    For instance, New Jersey recently filed a number of actions under its similar (and similarly unconstitutional and preempted) statute seeking to hold firearm manufacturers and sellers liable for producing and distributing lawful firearms in *and outside of* New Jersey.  *See, e.g.*, Complaint, *Platkin v. Glock, Inc.*, No. ESX-C-000286-24 (N.J. Super. Ct. Ch. Div. Dec. 12, 2024); Complaint, *Platkin v. FSS Armory, Inc.*, No. MRS C-000102-23 (N.J. Super. Ct. Ch. Div. Dec. 12,

2023); Amended Complaint, *Platkin v. Patriot Enters. Worldwide LLC*, No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023); Complaint, *Platkin v. Point Blank Guns & Ammo LLC*, No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) ("*Point Blank* Complaint"). Notably, New Jersey did so even after its attorney general secured vacatur of a preliminary injunction in and dismissal of a lawsuit brought by NSSF challenging New Jersey's analogue to HB947 by promising the Third Circuit that he would not "prosecut[e] [NSSF] or its members just for participating in 'lawful commerce,'" and would use New Jersey's law only to bring suits based on "industry members' 'own misconduct,'" not on the misconduct of third parties outside the control of NSSF or its members. *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 221 (3d Cir. 2023).

46.     New York has invoked its analogous statute to sue industry members for marketing and selling firearms parts kits without running background checks, even though no law required them to do so at the time. *See New York v. Arm or Ally, LLC*, 718 F.Supp.3d 310, 332-33 (S.D.N.Y. 2024), *motion to certify appeal granted*, 2024 WL 2270351 (S.D.N.Y. May 20, 2024).

47.     The Cities of Rochester and Buffalo, respectively, have brought suit under New York's law against the leading manufacturers of lawful handguns (including a number of NSSF members) alleging, among other things, that they failed to implement sufficient controls on the distribution of their lawful products to prevent criminals from obtaining them illegally. *See* Verified Complaint, *City of Rochester v. Smith & Wesson Brands, Inc.*, 2022 WL 19770082 (N.Y. Sup. Ct. Dec. 21, 2022); Verified Complaint, *City of Buffalo v. Smith & Wesson Brands, Inc.*, 2022 WL 19770081 (N.Y. Sup. Ct. Dec. 20, 2022).

48.     And the City of Chicago has brought suit pursuant to Illinois' analogous statute against Glock alleging public nuisance for lawful commerce, on a theory similar to the one in the

suit brought against Glock in Maryland under HB947.  *See* Complaint, *City of Chicago v. Glock, Inc.*, No. 2024-CH-06875 (Ill. Cir. Ct. July 22, 2024).

49.    Even in states that have not (or, at the time, had not) yet enacted laws like Maryland's, efforts to skirt the PLCAA have been on the rise.  For instance, Mexico sued several major U.S. firearm manufacturers on the theory that the lawful sale of lawful firearms in the United States has contributed to cartel violence south of the border in Mexico, *see Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 533 (1st Cir. 2024), *cert. granted*, 145 S.Ct. 116 (2024), and multiple individuals have sued NSSF members for producing and/or distributing AR-15s that deranged criminals employed in despicable acts of violence, *see, e.g.*, *Parsons v. Colts Mfg. Co.*, 499 P.3d 602 (Nev. 2021); *Roberts v. Smith & Wesson Brands, Inc.*, No. 22-LA-00000487 (Ill. Cir. Ct. filed Sept. 27, 2022); Second Amended Complaint, *Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL (Cal. Super. Ct. July 22, 2021).

50.    Fearing that they will be next, NSSF members have attempted to determine whether and how they might alter their business practices to comply with HB947's amorphous standards. Those endeavors have been difficult, if not impossible.  And some steps that might help guard against the risk of being sued under HB947 would come at the cost of significant reputational harm, lost sales, and serious downsizing.  To give just one example, after the New Jersey Attorney General sued a retailer for failing to confirm that all purchasers of magazines and rifle ammunition are not prohibited from possessing a firearm (something that neither federal nor New Jersey law requires), *see Point Blank* Complaint, *supra*, Tyler Firearms, a well-respected retailer in the Maryland community, attempted to determine if it would be possible to obtain that information. But as the shop owner discovered, the Federal Bureau of Investigation's National Instant Criminal Background Check System (NICS) does not permit retailers to obtain background checks for

16

magazine or ammunition sales. And after seeking input from Tyler Firearm's customer base, the owner confirmed that imposing an extra-legal identification requirement for magazine and rifle ammunition sales would significantly harm his business.

51.     As these and other recent events reflect, NSSF members face a concrete threat of being sued by the Attorney General under HB947 for lawfully manufacturing, marketing, and selling legal firearms and related products.

## JURISDICTION AND VENUE

52.     Plaintiff's causes of action arise under 42 U.S.C. §1983, *Ex parte Young*, 209 U.S. 123 (1908), and the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

53.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

54.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendants are located in and perform their official duties in the District of Maryland and are therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Preemption)

55.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

56.     The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision"

for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a federal law "imposes restrictions" and "a state law confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

57.     That is exactly the situation here. To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions:  Courts may not entertain any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by … a third party." 15 U.S.C. §7903(5)(A). Yet HB947 explicitly authorizes the Attorney General to sue "firearm-industry member[s]" for damages, injunctions, and other relief resulting from a third party's misuse of an industry member's products. Md. Code Ann., Cts. & Jud. Proc. §3-2503. That direct effort to countermand federal law is preempted.

58.     Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. §7902(a). Yet the whole point of HB947 is to authorize "qualified civil liability action[s]."

59.     The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product … [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party." *Id.* §7903(3), (5)(A).

60.     HB947 suits satisfy each element.

61.     A suit under HB947 [1] is a civil action that [2] can be brought by government officers:  The statute explicitly authorizes the Maryland "Attorney General, a county attorney, or the Baltimore City Solicitor" to bring "an action … under" its terms. Md. Code Ann., Cts. & Jud.

Proc. §3-2503(a).

62.    A suit under HB947 [3] can be brought "against a manufacturer or seller of a qualified product, or a trade association." 15 U.S.C. §7903(5)(A).  In fact, a suit under HB947 can be brought *only* against such a party; the statute applies to "firearm industry member[s]" and them alone.  Md. Code Ann., Cts. & Jud. Proc. §3-2502(a); *see id.* §3-2501(c) (defining "Firearm industry member" to mean "a person engaged in the sale, manufacture, distribution, importation, or marketing of a firearm-related product").

63.    Finally, HB947 [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See* 15 U.S.C. §7903(5)(A).  Indeed, that is the statute's *raison d'être*:  It subjects a firearm industry member to liability for harm caused by criminal third-party action, Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), if the industry member's "sale, manufacture, distribution, importation, or marketing" "contribute[s] to harm to the public," *id.*, or if the industry member fails to employ "reasonable controls" to keep guns out of the hands of third parties who misuse them, *id.* §§3-2501(f), 3-2502(b).  HB947 plainly authorizes the filing of "qualified civil liability actions" prohibited by the PLCAA.

64.    HB947 does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).  HB947 does not authorize suits commenced by the U.S. Attorney General to enforce any federal laws (*id.* §7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller unlawfully transferred a firearm (*id.* §7903(5)(A)(i)), negligently entrusted a firearm (*id.* §7903(5)(A)(ii)), breached a contract or warranty (*id.* §7903(5)(A)(iv)), or defectively made a product (*id.* §7903(5)(A)(v)).

65.    Nor does HB947 fit within the PLCAA's so-called "predicate exception," which

exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

66.     As the Ninth Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole." *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *accord City of New York*, 524 F.3d at 400.  And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearm industry member can understand and comply with, not statutes that merely impose broad duties of care, leaving it to courts to fill in the details later.  Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the kinds of novel public nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute." *City of New York*, 524 F.3d at 403; *see also Ileto*, 565 F.3d at 1137 (noting that, in enacting the PLCAA, "Congress was primarily concerned with novel nuisance cases like *Ileto*").

67.     At a minimum, HB947 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

68.     The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

69.    By its terms, HB947 does not require a violation of its second category of prohibited activities—*i.e.*, the absence of "reasonable controls"—to be "knowing."  Indeed, that provision does not contain any *mens rea* at all; it sets up a strict liability offense based on any failure to "establish and implement" "[r]easonable … policies" that are designed to achieve sweeping goals regarding the sale, manufacture, distribution, importing, or marketing of "firearm-related products."  Md. Code Ann., Cts. & Jud. Proc. §§3-2501(f), 3-2502(b).  Industry members thus can face liability for each and every failure to abide by that amorphous command, without regard to whether they knew their "policies" were unreasonable, which (once again) requires blind guessing at what is sufficiently designed to prevent or achieve HB947's abstract goals.

70.    And lest there be any doubt about what role intent has to play in HB947, the statute makes clear that the answer is none:  "A party seeking relief under this section is not required to prove that a firearm industry member acted with the intent to violate this subtitle."  *Id.* §3-2503(b).

71.    Making matters worse, HB947 does not require "proximate causation" in the traditional sense.  Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 211 (2019), and "proximate cause" is a familiar common-law term.  "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability."  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

72.    HB947 discards any such inquiry.  A "firearm industry member['s]" conduct is

21

expressly *deemed* to be "[a] violation" of HB947, and thus "a public nuisance," notwithstanding any intervening actions—including criminal actions by third parties.  Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(c); *see id.* §3-2501(f)(1).

73.    The Attorney General's recent lawsuit against NSSF member Glock underscores that HB947 does not incorporate traditional notions of proximate cause.  There, the Attorney General seeks to hold Glock liable for "carjackings, illegal drug sales, traffic violations, and violent crimes" wrought by any and all criminals who illegally convert legal Glock pistols into machineguns and then use those unlawful arms in nefarious ways.  *See, e.g.*, *Glock* Compl. ¶¶9, 59, 95-99.  Yet the Attorney General does not even purport to claim any connection between Glock and those criminal acts beyond the bare fact that Glock manufactured the pistols—which, again, are lawful in Maryland and all 49 other states.  *Id.*; *see also id.* ¶¶1-16.

74.    That kind of lawsuit, of course, is consistent with HB947's chief aim—imposing liability on law-abiding participants in the firearm industry for harms ultimately caused by third parties.  But it is fundamentally inconsistent with the traditional notions of proximate cause that the PLCAA incorporates.  For that reason, too, the PLCAA preempts HB947, either in whole or in part.

## COUNT TWO
### (Commerce Clause)

75.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

76.    Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnote omitted), the Supreme Court and the Fourth Circuit have long

and consistently held that the Commerce Clause, U.S. Const. art. I, §8, cl. 3, prohibits a state from "'directly regulat[ing]'"—that is, imposing liability based upon—conduct that takes place "'wholly outside the State' and involve[s] individuals 'having no connection with [it],'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (italics omitted) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (plurality op.)); *see also Ass'n for Accessible Meds. v. Frosh* ("*AAM*"), 887 F.3d 664, 666 (4th Cir. 2018) (invalidating Maryland law because it "directly regulates … transactions that occur outside Maryland").

77.    HB947 violates this bedrock constitutional constraint.

78.    As an initial matter, it is important to underscore that HB947 does not regulate products.  It regulates conduct.  And for purposes of the Commerce Clause, what matters is where the conduct that is alleged to violate the statute—i.e., that is the basis of liability—occurred.  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor, *e.g.*, is incorporated in or does some other business in the regulating state.  *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999).

79.    Two types of conduct can violate HB497.  "[T]he sale, manufacture, distribution, importation, or marketing of a firearm-related product" violates if HB947 if a court finds that "[a] firearm industry member … knowingly … contribute[d] to harm to the public" in Maryland "through" that "conduct" (and that the conduct is either unlawful or unreasonable).  Md. Code Ann., Cts. & Jud. Proc. §3-2502(a).  And the failure to "establish and implement reasonable controls regarding the sale, manufacture, distribution, importation, marketing, possession, and use of the firearm industry member's firearm-related products" is a violation under §3-2502(b).

80.    Very little of *that* conduct happens in Maryland, at least at the manufacturer level, for the simple reason that few (if any) firearm manufacturers do business in the state.  *See id.* §3-

23

2501(c) (a person or firm can be a "[f]irearm industry member" under HB947 even if it does no business in Maryland).

81.     To the extent HB947 applies to conduct that takes place out of state, it is unconstitutional.  As the Fourth Circuit held in *AAM*, a Maryland law like HB947 that "effectively seeks to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland" violates the Commerce Clause.  887 F.3d at 672.

82.     That is true even if that out-of-state conduct has effects in Maryland, and even though HB947 defines "[f]irearm-related product" to mean "a firearm, ammunition, … or [related product] that is … [s]old, manufactured, distributed, or marketed in the State" or "[i]ntended to be."  Md. Code Ann., Cts. & Jud. Proc. §3-2501(d).  Again, HB947 does not regulate products; it regulates conduct.  And when "the conduct the Act targets … occur[s] outside Maryland," the Constitution prevents Maryland from directly regulating it, even if that out-of-state conduct "'has effects within the State.'"  *AAM*, 887 F.3d at 671-72.

83.     Making matters worse, HB947 authorizes courts to *enjoin* practices that violate its terms even if the practices occur out of state and are lawful where they occur.  *See* Md. Code Ann., Cts. & Jud. Proc. §3-2503(a)(2)(i).  And, again, it requires firearm industry members to "establish and implement reasonable controls regarding the sale, manufacture, distribution, importation, marketing, possession, and use of … firearm-related products," even as to conduct that takes place entirely outside of Maryland.

84.     By directly regulating commerce that takes place in other states, HB947 plainly violates the constitutional prohibition on extraterritorial state regulation.

85.     HB947 violates the Commerce Clause in another way as well.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce

Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" *within* their borders. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). HB947 does that too. Because it imposes liability for commercial transactions occurring in other states, HB947 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

## COUNT THREE
### (First Amendment)

86. Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

87. HB947 does not just regulate commerce ("the sale, manufacture, distribution, [and] importation … of a firearm-related product"). It also regulates "marketing"—i.e., speech protected by the First Amendment. "A firearm industry member" may be held liable under HB947 if its "marketing" is deemed to have "contribute[d] to harm to the public" or if it failed to employ "reasonable controls" as to its "marketing." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(b).

88. That is a textbook First Amendment violation.

89. Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91, 799 (2011). HB947 does both of those things. And far from being narrowly tailored or even closely drawn to achieve a compelling or important government interest, HB947 is radically overbroad in relation to any legitimate objective it may further.

90. Start with content-based discrimination. HB947 undoubtedly regulates speech based on its content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a firearm-related product*." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)

(emphasis added).  Indeed, HB947 does not even apply to all speech about firearms—only the speech of "firearm industry member[s]," *i.e.*, those "engaged in the sale, manufacture, distribution, importation, or marketing of a firearm-related product." *Id.* §§3-2501(c), 3-2502(a).  That speaker-based discrimination is no accident.  HB947 fixates on firearm-related speech by firearm-related actors because their speech is uniquely likely to communicate a particular *viewpoint* that Maryland disfavors.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

91.    The topics and views that Maryland has singled out in HB947 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment.  *See Brown*, 564 U.S. at 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980).  But HB947 does not purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about legal products—products expressly protected by the Constitution, no less—*even when that speech is truthful and not misleading*.  The words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that publishes advertisements containing entirely accurate specifications of its legal products—ammunition size, magazine capacity, weight, retail price, etc.—thus could be liable under HB947.  So could an industry member who fails to establish what Maryland deems to be a "reasonable control[]" with respect to its marketing materials (whatever that may be)—again, no matter how accurate those materials are.  Md. Code Ann., Cts. & Jud. Proc. §3-2502(b).  That is no hypothetical:  The Attorney General is actively seeking to hold Glock liable for the bare marketing of legal pistols to civilians.  *See Glock* Compl. ¶120 (seeking "an order enjoining Glock from engaging in … marketing … of [its] Glock pistols"); *id.* at 50 (same).

92.    That the product being marketed could be dangerous or misused does not render

speech promoting it entitled to any less constitutional protection. Truthful speech promoting a legal product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (plurality op.) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion). Simply put, the mere fact that a product is potentially dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed. And that is, of course, true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

93. Maryland thus could justify HB947 only by affirmatively proving that it is sufficiently tailored to achieve a sufficiently important state interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608-10 (2021). That, it cannot do, as HB947 is both "seriously underinclusive" and "seriously overinclusive" in relation to any public safety interests the state may assert. *Brown*, 564 U.S. at 805. While purportedly aimed at an epidemic of gun violence, HB947 does *nothing* to police the conduct of criminals who misuse firearms to perpetrate violence and endanger the public's health and safety. Nor does it regulate vast swaths of speech—*e.g.*, action and horror films, video games, direct incitements to violence, and countless other forms of expression—that may glorify and even encourage criminal gun violence, leaving it "wildly underinclusive," *id.* at 801-02, even as a regulation of speech. Conversely, by imposing sweeping liability—and even potentially punitive damages—for *any* firearms marketing that could later be thought to "contribute to harm to the public" in Maryland, Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), even if it is nothing more than entirely truthful, non-misleading speech, HB947 is "vastly

overinclusive" as well, *Brown*, 564 U.S. at 804. HB947 thus has the inevitable effect of "prohibit[ing] or chill[ing]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973).

94.     Not only is HB947 not remotely tailored to any permissible state objective; it also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

95.     HB947 does precisely the opposite. Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights (and impeding the exercise of Second Amendment rights in the process).

96.     By its terms, HB947 renders unlawful any marketing that could be said to have "contribute[d] to harm to the public," Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), and it does not define what "harm to the public" means. HB947 thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such incomprehensible and subjective abstractions do not articulate at all—let alone articulate with "narrow specificity," *NAACP*, 371 U.S. at 433—what kind(s) of speech may later be deemed to have contributed to a "public nuisance."

97.     That profound uncertainty not only "raises special First Amendment concerns

because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute. *Reno*, 521 U.S. at 871-72. After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). And that threat is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id.* That inherent vagueness dooms HB947 under the First Amendment as well. *See Reno*, 521 U.S. at 870-72.

98.    There is another problem too. Even when speech about a product is actually false or misleading—which, again, HB947 does not require—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought before liability may be imposed. *See, e.g.*, *Restatement (Second) of Torts* §525 (Oct. 2024 Update); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate that it injured them, then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet HB947 does not even require proof of reliance.

99.    Adding insult to injury, HB947 does not require a plaintiff to trace alleged injuries directly to the speech in question. On the contrary, under HB947, the conduct of a firearm industry

member, *including its speech*, is deemed to constitute a proximate cause of the public nuisance notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties. Md. Code Ann., Cts. & Jud. Proc. §3-2502(c). The First Amendment demands far more, particularly of speaker-based restrictions on speech. *See Sorrell*, 564 U.S. at 565-66.

100. The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections. That is true even of torts that pre-date the Republic and the First Amendment. And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree. HB947 flunks First Amendment 101 at every turn.

### COUNT FOUR
### (Second Amendment)

101. Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

102. "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17; *see also* 15 U.S.C. §7901(a)(1)-(2). And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677. Commerce in arms is thus constitutionally protected. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

103. HB947 infringes this essential component of the Second Amendment right to keep and bear arms. A law that regulates Second Amendment activity is unconstitutional unless the state can prove that it "is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 689. HB947 is not remotely consistent with that tradition. In fact,

30

federal courts and Congress alike have held that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented." *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same). Maryland thus cannot "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

104.    That is especially obvious given the Attorney General's claim that he can use HB947 to enjoin Glock from selling one of the most popular pistols in America to law-abiding citizens in Maryland (and beyond). *See, e.g.*, *Glock* Compl. ¶120, p.50.

105.    In short, there is no doubt: HB947 violates the Second Amendment.

## COUNT FIVE
### (Due Process)

106.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

107.     For many of the same reasons that HB947 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to *all* the conduct it polices. The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926). So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

108.    Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," this anti-vagueness guarantee applies to both criminal and civil laws.

*See id.* at 108-09 & nn.3-8 (collecting cases); *see also Sessions v. Dimaya*, 584 U.S. 148, 175-80 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

109.    For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies for statutes that "threaten[] to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  The most protective vagueness standard known to our law thus applies here several times over.  HB947 not only directly regulates speech, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them.  And the liability HB947 threatens is no small matter:  "[i]njunctive relief;" "[r]estitution;" "[c]ompensatory and punitive damages;" "[r]easonable attorney's fees and costs;" and "[a]ny other appropriate relief."  Md. Code Ann., Cts. & Jud. Proc. §3-2503(a)(2).  HB947 thus ushers in the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, HB947 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

110.    HB947 flunks that test, as the prohibitions it imposes are hopelessly vague.  The statute makes it unlawful for a "firearm industry member" to, *inter alia*, "contribute to harm to the public through the sale, manufacture, distribution, importation, or marketing of a firearm-related product by engaging in conduct that is" either "[u]nlawful" or "*[u]nreasonable under the totality*

*of the circumstances*." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a) (emphasis added). That command leaves industry participants (who already must comply with an interlocking web of federal, state, and local laws) without any guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without potentially running afoul of the statute.

111. For starters, the "[u]nreasonable" conduct that HB947 polices may, by definition, be entirely lawful: What is unreasonable, the statute says, is different from what is already "[u]nlawful" under federal, state, or local law. *Id.* Additionally, "the totality of the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has acted "through the sale, manufacture, distribution, importation, or marketing of a firearm-related product." *Id.* There is thus no way to know *ex ante*—i.e., when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed "[u]nreasonable under the totality of the circumstances."

112. Even if an industry member could somehow conceive of all relevant circumstances yet to come, moreover, it remains a mystery what "reasonable controls" means—especially when it is defined to mean something more than complying with the law. And the statute's modest effort to supply a definition only makes matters worse: Rather than identify a firearm industry member's concrete obligations with specificity, HB947 issues a sweeping command that industry members adopt any and all "policies" to prevent or ensure a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *Id.* §3-2501(f).

113. To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved;

but rather the indeterminacy of precisely *what that fact is*." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added). The problem with HB947 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever. Determining, for example, what promotes (or disserves) the public convenience invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

114.    Indeed, HB947 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). And the common law is no guide, as the suits that HB947 contemplates (including the lawsuit that Maryland has already filed against NSSF member Glock) are a radical departure from any known concept of public nuisance or any other tort. Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, HB947 "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis," with the attendant dangers of arbitrary and discriminatory application. *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999). The Due Process Clause demands far more.

115.    And that is not the only due process problem with HB947. Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law. *See, e.g.*, *Restatement (Second) of Torts* §430 (Oct. 2024 Update); *Bank of Am.*, 581 U.S. at 201; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014). Indeed, even strict-liability torts require proof of causation. *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (Oct. 2024 Update). That is not just tradition; it is constitutionally mandated. It has long been settled that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause." *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).

116.    Denying a defendant a meaningful opportunity to demonstrate that it did not

actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property. Yet HB947 does just that by reimaging proximate cause to include chains of events that extend not only far out of state and back in time, but through the criminal acts of third parties. The Constitution does not permit such breathtaking liability.

117.    HB947's radical relaxing of the traditional requirements of causation not only compounds the vagueness problem, but independently violates due process.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief from the Court:

1.    a declaration, pursuant to 28 U.S.C. §2202, that HB947 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that HB947 is unconstitutional as applied to NSSF and its members;

2.    a preliminary injunction enjoining the Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB947;

3.    a permanent injunction enjoining the Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB947;

4.    such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.    nominal damages; and

6.    any further relief the Court deems just and proper.

Respectfully submitted,

s/James W. Porter III
JAMES W. PORTER III (BAR NO. 19416)
JOHN PARKER SWEENEY (BAR NO. 08761)
BRADLEY ARANT BOULT CUMMINGS, LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
(202) 719-8232
jporter@bradley.com

PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
NICHOLAS A. AQUART**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* *Pro hac vice* application forthcoming.

** Supervised by principals of the firm who are members of the Virginia Bar; *pro hac vice* application forthcoming.

*Counsel for Plaintiff*

April 3, 2025