**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) No. _____ |
| | ) |
| ANTHONY G. BROWN, | ) |
| Attorney General of Maryland, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

JURISDICTION ................................................................................................................. 3

ARGUMENT ..................................................................................................................... 3

I.     NSSF Is Likely To Succeed On The Merits ..................................................... 4

       A.     HB947 Is Preempted ................................................................................. 4

       B.     At a Minimum, HB947 Is Preempted to the Extent It Requires Neither
              Knowing Violations nor Proximate Cause ........................................... 11

       C.     HB947 Violates the Commerce Clause .................................................. 13

       D.     HB947 Violates the First Amendment ................................................... 17

       E.     HB947 Is Void for Vagueness ............................................................... 23

       F.     HB947 Violates the Second Amendment .............................................. 26

II.    The Remaining Factors All Favor Injunctive Relief ........................................ 26

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ................................................................................................ 18, 19

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ....................................................................................................... 20

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ....................................................................................................... 21

*Ass'n for Accessible Meds. v. Frosh,*
    887 F.3d 664 (4th Cir. 2018) ......................................................................................... 16

*Ass'n of Am. Publishers, Inc. v. Frosh,*
    586 F.Supp.3d 379 (D. Md. 2022) ................................................................................. 30

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ....................................................................................................... 21

*Bank of Am. Corp. v. City of Miami,*
    137 S.Ct. 1296 (2017) .................................................................................................... 13

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ....................................................................................................... 19

*BMW of N. Am. Inc. v. Gore,*
    517 U.S. 559 (1997) ....................................................................................................... 17

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ....................................................................................................... 21

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011) ............................................................................................ 18, 20, 21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ....................................................................................................... 18

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    142 S.Ct. 1464 (2022) .................................................................................................... 18

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ....................................................................................................... 20

*City of N.Y. v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) ................................................................................. *passim*

*Comptroller of Treasury of Maryland v. Wynne,*
    575 U.S. 542 (2015)............................................................................... 16

*Connally v. Gen. Constr. Co.,*
    269 U.S. 385 (1926)............................................................................... 24

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.,*
    368 U.S. 278 (1961)............................................................................... 24

*District of Columbia v. Beretta U.S.A. Corp.,*
    940 A.2d 163 (D.C. 2008)...................................................................... 10

*dmarcian, Inc. v. dmarcian Eur. BV,*
    60 F.4th 119 (4th Cir. 2023).................................................................... 3

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982)............................................................................... 16

*Elrod v. Burns,*
    427 U.S. 347 (1976)............................................................................... 27

*Ex parte Young,*
    209 U.S. 123 (1908)................................................................................. 3

*Fernández-Vargas v. Pfizer,*
    522 F.3d 55 (1st Cir. 2008) ................................................................... 29

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002).................................................................. 30

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)............................................................................... 24

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999)............................................................................... 19

*Greater Phila. Chamber of Com. v. City of Philadelphia,*
    949 F.3d 116 (3d Cir. 2020)................................................................... 20

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983).................................................................. 8

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,*
    642 A.2d 219 (Md. 1994)....................................................................... 13

*Hazardous Waste Treatment Council v. South Carolina,*
    945 F.2d 781 (4th Cir. 1991).................................................................. 30

*Hillman v. Maretta,*
   569 U.S. 483 (2013) ............................................................................ 9

*Holmes v. Secs. Inv. Prot. Corp.,*
   503 U.S. 258 (1992) .......................................................................... 13

*Ileto v. Glock, Inc.,*
   565 F.3d 1126 (9th Cir. 2009) ..................................................2, 6, 10, 11

*In re Academy, Ltd.,*
   625 S.W.3d 19 (Tex. 2021) ............................................................... 29

*Jam v. Int'l Fin. Corp.,*
   139 S.Ct. 759 (2019) ........................................................................ 12

*Johnson v. United States,*
   576 U.S. 591 (2015) .......................................................................... 26

*Kansas v. Garcia,*
   140 S.Ct. 791 (2020) .......................................................................... 4

*KS&E Sports v. Runnels,*
   72 N.E.3d 892 (Ind. 2017) ................................................................ 29

*Legend Night Club v. Miller,*
   637 F.3d 291 (4th Cir. 2011) ......................................................... 27, 30

*Lorillard Tobacco Co. v. Reilly,*
   533 U.S. 525 (2001) .......................................................................... 19

*Midland Asphalt Corp. v. United States,*
   489 U.S. 794 (1989) .......................................................................... 28

*Minard Run Oil Co. v. U.S. Forest Serv.,*
   670 F.3d 236 (3d Cir. 2011) ............................................................. 30

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ............................................................................. 26

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) .......................................................................... 23

*NAACP v. Button,*
   371 U.S. 415 (1963) .......................................................................... 21

*Nat'l Pork Producers Council v. Ross,*
   598 U.S. 356 (2023) .......................................................................... 16

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................ 30

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017) ................................................................... 30

*Reno v. ACLU,*
    521 U.S. 844 (1997) ......................................................................... 21, 22

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995) ................................................................................ 19

*Sambrano v. Savage Arms, Inc.,*
    338 P.3d 103 (N.M. Ct. App. 2014) ....................................................... 29

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ................................................................. 18, 20, 23

*Thornhill v. Alabama,*
    310 U.S. 88 (1940) ................................................................................ 23

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) .................................................................................. 7

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ................................................................................ 30

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................................................................ 26

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................................ 26

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ................................................................................ 24

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler,*
    537 U.S. 371 (2003) .................................................................................. 7

**Constitutional Provisions**

U.S. Const. amend. XIV, §1 ............................................................................ 24

U.S. Const. art. I, §8, cl. 3 ............................................................................ 16

**Statutes**

15 U.S.C. §7901(a)(4) .................................................................................... 9

15 U.S.C. §7901(a)(5) ............................................................................. 1, 9

15 U.S.C. §7901(a)(6) ......................................................................... 9, 17, 24

15 U.S.C. §7901(a)(7) ........................................................................... 9, 26

15 U.S.C. §7901(b)(1) ................................................................................. 9

15 U.S.C. §7902(a) ......................................................................... 1, 5, 28

15 U.S.C. §7903(5)(A) ...................................................................... *passim*

18 U.S.C. §922(a)(5) .............................................................................. 28

Md. Code Ann., Cts. & Jud. Proc. §3-2501(c) ......................................... 13

Md. Code Ann., Cts. & Jud. Proc. §3-2501(d) ................................... 14, 15

Md. Code Ann., Cts. & Jud. Proc. §3-2501(f) ................................ 1, 11, 25

Md. Code Ann., Cts. & Jud. Proc. §3-2501(f)(1) ..................................... 12

Md. Code Ann., Cts. & Jud. Proc. §3-2501(f)(2) ..................................... 15

Md. Code Ann., Cts. & Jud. Proc. §3-2502 ............................................... 4

Md. Code Ann., Cts. & Jud. Proc. §3-2502(a) ................................... *passim*

Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)(1) ............................... 14, 22

Md. Code Ann., Cts. & Jud. Proc. §3-2502(b) ................................... *passim*

Md. Code Ann., Cts. & Jud. Proc. §3-2502(c) ................................ 1, 12, 23

Md. Code Ann., Cts. & Jud. Proc. §3-2503(a) ......................................... 27

Md. Code Ann., Cts. & Jud. Proc. §3-2503(a)(2) ................... 4, 14, 16, 24

Md. Code Ann., Cts. & Jud. Proc. §3-2503(b) ......................................... 11

27 C.F.R. §478.102(a) ............................................................................ 28

**Other Authorities**

Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down the Gun Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r ..................................... 29

Amended Complaint, *Platkin v. Patriot Enters. Worldwide LLC*, No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023) ......................................... 14

Complaint, *Mayor of Balt. v. Glock, Inc.*, No. C-24-CV-25-001450
(Md. Cir. Ct. Feb. 12, 2025)................................................................. 5, 13, 19, 27

Complaint, *Platkin v. Point Blank Guns & Ammo LLC*,
No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) .................................... 8, 28

Consent Order and Final Judgment, *Platkin v. Point Blank Guns & Ammo LLC*,
No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Mar. 13, 2025)......................................... 29

James B. Jacobs & Zoe A. Fuhr, *Universal Background Checking—New York's
Safe Act*, 79 Alb. L. Rev. 1327 (2016) ...................................................................... 28

Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic
Impact Report* (2022), https://bit.ly/3BdsM9p.......................................................... 17

*Restatement (Second) of Torts* (1977)............................................................................ 23

Steven Spearie, *Gun Dealer: New Illinois Law Will 'Put a Hammer' On Us*, State
J. Reg. (July 22, 2019), https://bit.ly.2HjXess ......................................................... 29

## INTRODUCTION

In 2005, Congress passed the Protection of Lawful Commerce in Arms Act to stamp out efforts to use nebulous state-law "reasonableness" standards to hold law-abiding manufacturers and sellers of firearms liable for harms caused by criminals who misuse their products. That purpose is evident on the face of the statute: Congress declared in the text that the PLCAA's core aim is to prevent lawsuits seeking redress from businesses engaged in lawful commerce "for the harm caused by those who criminally or unlawfully misuse firearm products . . . that function as designed and intended." 15 U.S.C. §7901(a)(5). To that end, the PLCAA broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related] product" for injuries "resulting from the . . . misuse of a [firearm or related] product by . . . a third party." *Id.* §§7902(a), 7903(5)(A). That rule is subject to only a narrow set of enumerated exceptions, all for suits involving direct and unambiguous misconduct by the manufacturer or seller itself.

Maryland House Bill 947 is an unabashed attempt to end-run the PLCAA. Under HB947, a manufacturer or seller of firearms may be held liable if it fails to "establish and implement reasonable controls regarding the sale, manufacture, distribution, importation, marketing, possession, and use of . . . firearm-related products," Md. Code Ann., Cts. & Jud. Proc. §3-2502(b), which the statute (unhelpfully) defines to mean "policies that are designed . . . [t]o prevent the loss or theft of a firearm-related product" and "prevent the sale or distribution of a firearm-related product to . . . [a] person prohibited from possessing a firearm," *id.* §3-2501(f). "A firearm industry member" may also be held liable if it "knowingly create[s], maintain[s], or contribute[s] . . . through the sale, manufacture, distribution, importation, or marketing of a firearm-related product" to "a public nuisance," which the statute (unhelpfully) fails to even define, if that "conduct" is *either* "[u]nlawful" *or* "[u]nreasonable under the totality of the circumstances." *Id.* §3-2502(a), (c). The statute thus allows federally licensed manufacturers and sellers to be held liable under

nebulous state-law "reasonableness" standards for harms caused by third parties—even when their own conduct was lawful, no less. In other words, it authorizes exactly what the PLCAA prohibits.

Maryland likely will try to defend HB947 by invoking the PLCAA's so-called "predicate exception," which allows suits alleging that a manufacturer or seller "knowingly violated a State . . . statute applicable to the sale or marketing of" firearms if "the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. §7903(5)(A)(iii). But as court after court has held, statutory text, structure, and context—not to mention basic common sense—foreclose any argument that the predicate exception empowers states to revive the very suits that Congress passed the PLCAA to inter. To conclude otherwise would "allow the predicate exception to swallow the statute." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008). The predicate exception instead exempts actions only when they are predicated on the *knowing* violation of a law that imposes clear and concrete obligations or prohibitions on industry members. It does not implicate statutes that, like HB947, merely impose generic duties of reasonableness for courts to develop after the fact, and disregard *mens rea* and proximate cause in the process, thus operating no differently from the novel common-law actions that motivated Congress to enact the PLCAA in the first place. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135-36 (9th Cir. 2009).

That is reason enough to invalidate HB947. But additional reasons abound. HB947 regulates commerce in and speech relating to lawful firearms even when the commerce and speech take place *outside of Maryland*. Doing so is in clear violation of the Commerce Clause, which prohibits states from directly regulating commerce beyond their borders even when it has effects within the state. Likewise, the statute unconstitutionally restricts and chills speech and invites arbitrary enforcement by imposing liability on firearm industry members for marketing their products "unreasonably," and it green-lights the imposition of liability based on truthful, non-

misleading speech about lawful products, all without proof of reliance. If that were not enough, the statute tramples Second Amendment rights and is void for vagueness to boot.

NSSF is likely to succeed on its claims, and the remaining factors likewise favor injunctive relief. Subjecting NSSF members to an unconstitutional law inflicts irreparable harm as a matter of law, and every dollar spent trying to decipher and comply with the new statute is irreparable harm, too, given the Eleventh Amendment. Those harms are far from speculative, as the Maryland Attorney General has already begun enforcing HB947 against NSSF member Glock, Inc., which he seeks to hold responsible for the criminal acts of third parties who have illegally converted popular Glock pistols into illegal machineguns and allegedly wreaked havoc in the state. And other states with laws strikingly similar to HB947 have resuscitated PLCAA-barred litigation that seeks to impose crushing liability on the firearm industry for lawful conduct. Notably, the attorney general of New Jersey has done so despite promising a court that it would not use New Jersey's analogous statute to foist liability for the criminal actions of third parties onto industry members who are engaged in lawful commerce in arms, as have other local officials. Finally, the balance of equities and public interest support injunctive relief, as enforcement of an unconstitutional law is always contrary to the public interest, and a state and its officers suffer no cognizable harm by being enjoined from enforcing such a law. The Court should enjoin enforcement of HB947.

## JURISDICTION

NSSF challenges the validity of HB947 pursuant to 42 U.S.C. §1983, *Ex parte Young*, 209 U.S. 123 (1908), and the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. §1331.

## ARGUMENT

The Court should preliminarily enjoin HB947 because NSSF is likely to prevail on the merits, denying an injunction would lead to irreparable injury, and the equities and public interest favor an injunction. *See dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023).

I.      **NSSF Is Likely To Succeed On The Merits.**

A.   **HB947 Is Preempted.**

When a federal law "imposes restrictions" and "a state law confers rights . . . that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quotation marks omitted).  That is exactly the situation here. The PLCAA imposes clear restrictions:   No court may hear a "civil action . . . against a manufacturer or seller of a [firearms] product . . . for damages . . . resulting from the criminal or unlawful misuse of a qualified product by . . . a third party."  15 U.S.C. §7903(5)(A).  HB947 in turn confers conflicting rights:   It authorizes the imposition of liability on "firearm industry members" and damages resulting from a third party's misuse of an industry member's products. Md. Code Ann., Cts. & Jud. Proc. §§3-2502(a), 3-2503(a)(2).  HB947 is therefore preempted.

The PLCAA preempts state efforts to subject those who manufacture or sell firearm products to liability for harms "resulting from the criminal or unlawful misuse of a qualified product by . . . a third party."  15 U.S.C. §7903(5)(A).  Yet that is exactly what HB947 seeks to do. Indeed, saddling firearm industry members with liability for injuries "resulting from" third parties' misuse of their products is the statute's whole point.   HB947 is designed to make companies engaged in the "sale, manufacture, distribution, importation, or marketing" of firearms and "firearm-related product[s]" pay for harms resulting from criminal gun violence perpetrated by others.  Md. Code Ann., Cts. & Jud. Proc. §3-2502.  And HB947 does just that twice over.  It subjects a firearm industry member to all manner of sweeping liability for harms caused by intervening criminal acts if the industry member's "sale, manufacture, . . . or marketing" is deemed to have "contribute[d] to harm to the public," *id.* §3-2502(a)—which, if taken literally, will be true anytime a third party commits a crime with a firearm, given that the manufacture of a firearm necessarily "contributes" to someone's subsequent misuse of it.  And it subjects a firearm industry

member to liability if the member is deemed to have failed to employ "reasonable controls" to keep firearms away from third parties who misuse them, *id.* §3-2502(b)—whatever that means.

One need look no further than the Attorney General's recent and inaugural enforcement action against an NSSF member (Glock) to see how HB947 ushers in exactly what the PLCAA sought to usher out.  In that action, the Attorney General seeks to hold Glock liable for "carjackings, illegal drug sales, traffic violations, and violent crimes" committed by third-party criminals who used illegal machinegun conversion devices ("MCDs") to modify their Glock pistols into illegal machineguns that they then used to cause "terror throughout" the State. Complaint ¶¶9, 59, 95-99, 128, *Mayor of Balt. v. Glock, Inc.*, No. C-24-CV-25-001450 (Md. Cir. Ct. Feb. 12, 2025) ("*Glock* Compl.").  According to the Attorney General, simply because Glock is allegedly aware that such criminal conduct sometime occurs, its lawful design and sale of legal and immensely popular pistols is harming "the safety and health of the public," in violation of HB947.  *Id.* ¶114; *see id.* ¶105-21.  While those allegations are baseless, that is beside the point here.  What matters is that HB947 plainly seeks to revive exactly the kind of suits—based on "the criminal or unlawful misuse of" an industry member's lawfully made and lawfully sold products— that the PLCAA says "may not be brought."  15 U.S.C. §§7902(a), 7903(5)(A).

The only question, then, is whether HB947 falls within any of the PLCAA's exceptions.  It does not.  The Attorney General likely will argue that HB947 fits within the so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  *Id.* §7903(5)(A)(iii).  It does not.  To be sure, HB947 is a statute that applies to the sale or marketing of firearms.  But the predicate exception cannot sensibly be read to exempt any and all statutes that

5

apply to the firearm industry (explicitly or not), as such a capacious reading "would allow the predicate exception to swallow the statute, which was intended to shield the firearm industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of New York*, 524 F.3d at 403. Nor can it sensibly be read to exempt the very suits that the PLCAA was enacted to foreclose. Text, structure, context, and common sense instead all make clear that the only kinds of statutes that qualify as predicate statutes are ones that impose concrete obligations or prohibitions directly on industry members (and that could be tested for consistency with the Second Amendment), not statutes that, like HB947, impose only amorphous duties of care vis-à-vis the misconduct of third parties.

Starting with the statutory text, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *City of New York*, 524 F.3d at 400; *accord Ileto*, 565 F.3d at 1134-35. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception covers only those laws that impose concrete obligations and prohibitions directly on manufacturers and sellers with respect to manufacturing and sales, not simply any law that applies to the industry or regulates manufacturing and selling in some general sense.

First, by its terms, the predicate exception exempts only civil actions that require proof that the defendant "*knowingly* violated" the relevant statute. 15 U.S.C. §7903(5)(A)(iii) (emphasis added). That presumes some requirement sufficiently concrete that a manufacturer or seller can actually *knowingly* violate it. A manufacturer can knowingly comply (or not) with a command to manufacture in certain ways, and a seller can knowingly comply (or not) with a command to conduct a background check, or to keep specified records, or to not sell to someone known to be prohibited from possessing a gun. But it is hard to fathom how an industry member who complies

with all of the multitude of federal, state, and local laws that explicitly state what it may and may not do would "know" that it nonetheless has failed to employ "reasonable controls," or has conducted its lawful business in a manner so "[u]nreasonable under the totality of the circumstances" that it can be said to have "contribute[d] to" some undefined "harm to the public." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(b).

The illustrative examples Congress supplied in the PLCAA of "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), reinforce the conclusion that Congress was focused on laws that impose concrete commands, not vague duties of care that could be alleged to have been violated years after the manufacture or sale. As the Second Circuit has recognized, "the general language . . . providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to statutes imposing record-keeping requirements on the firearm industry, . . . and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers." *City of New York*, 524 F.3d at 402. "Thus," under basic principles of interpretation, the general "applicable to" language must be "construed to embrace only objects similar [in nature] to those [objects] enumerated by" the two specific examples that follow. *Id.* (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)). And each of those examples requires a knowing violation of a concrete obligation or prohibition. The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter appropriate information, or aiding, abetting, or conspiring with someone to make a material false statement. 15 U.S.C. §7903(5)(A)(iii)(I); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023) (aiding-and-abetting liability limited to cases where "the defendant . . . knowingly and substantially assist[ed]

the principal violation" (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983))).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  15 U.S.C. §7903(5)(A)(iii)(I).

Those examples look nothing like HB947, which commands industry members to conduct their operations reasonably, without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "[u]nreasonable under the totality of the circumstances," and which could cover circumstances that become evident only long after the manufacture, sale, distribution, or marketing of their product.  *See* Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(b).  Take, for instance, the lawsuit New Jersey recently filed against a retailer under its analogous firearms-industry-only "public nuisance" statute.  Neither New Jersey nor federal law requires retailers to demand any form of identification from or secure any kind of background check on customers who purchase magazines or rifle ammunition.  Yet according to New Jersey's lawsuit, a retailer who fails to do so has not employed "reasonable controls," and so has contributed to a public nuisance.  *See* Complaint, *Platkin v. Point Blank Guns & Ammo LLC*, No. MRS-C-000123-24 (N.J. Super. Ct. Ch. Div. Nov. 13, 2024) ("*Point Blank* Complaint").  It remains a mystery how a retailer who meticulously complies with every aspect of federal, state, and local law is supposed to know in real-time that failing to do something no law requires is so unreasonable as to be unlawful, and to expose the retailer to potential liability for violence perpetrated by third parties.

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not just duties of care.  As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale . . . of firearms or [related]

products . . . liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). And as the Second Circuit has recognized, the term "lawful" there means "done in compliance with statutes like those described in" the immediately preceding finding—*i.e.*, "the Gun Control Act of 1968, the National Firearms Act, and the Arms [Export] Control Act." *City of New York*, 524 F.3d at 402-03; *see* 15 U.S.C. §7901(a)(4). Those statutes do not impose amorphous commands to manufacture, sell, distribute, or market firearms "reasonably," leaving judges and juries to decide what that means later. They are comprehensive regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, that an industry member can sensibly be said to violate *knowingly*) in real time.

Finally, reading the predicate exception to exempt statutes like HB947 would effectively gut the PLCAA. This is not a case in which one must comb through obscure legislative history to divine "Congress' purposes and objectives." *Hillman v. Maretta*, 569 U.S. 483, 491 (2013). Congress enshrined them right in the statute. The unambiguous objective of the PLCAA is to foreclose efforts to impose liability on those engaged in lawful commerce in firearms through novel and expansive "theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7). As courts recognized, the problem Congress had with the pre-PLCAA tort suits was that they sought to "expand civil liability" well beyond its traditional moorings, constituting "an abuse of the legal system." *Id.* §7901(a)(6)-(7). Congress thus opted "[t]o prohibit [such] causes of action" entirely, without regard to whether they are brought pursuant to tort law or a statute codifying it and no matter how monikered. *Id.* §7901(b)(1). That is why, for instance, the District of Columbia's highest court held that a D.C. law making industry members "'strictly liable in tort' for . . . injuries resulting from the discharge

of an assault weapon" they made or sold could not serve as a predicate statute, as it "merely" "impose[d] a duty to pay compensation" if "a person is . . . injured by the discharge of an assault weapon," and thus is no different from the sprawling claims Congress set out to inter. *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 167, 170-72 (D.C. 2008). In short, "Congress clearly intended to preempt common-law claims, such as general tort theories of liability," like "negligence and nuisance." *Ileto*, 565 F.3d at 1135. And as the Ninth Circuit squarely held in *Ileto*, the PLCAA effectuates that intent by preempting such claims even when they are premised on a statute codifying those common-law theories. *Id.* at 1135-36.

It thus makes no difference that HB947 is a statute. *See id.* at 1138 (holding "that Congress intended to preempt general tort law claims" even when a state "codifie[s] those claims in its civil code"); *Beretta*, 940 A.2d at 168-72 (same). If a suit based on exactly the same theories of liability could not be sustained under the common law, then it cannot be that the exact same lawsuit is fine so long as a state codifies that theory in a statute. Congress' aim in enacting the PLCAA was not to prompt states to codify their novel theories and reinitiate the same litigation all over again. Congress wanted to foreclose the kind of regulation-via-litigation that pre-PLCAA lawsuits sought to accomplish—*i.e.*, using "judicial evolution" to hold industry members liable after the fact for conduct that complied with applicable laws and regulations at the time. *Ileto*, 565 F.3d at 1136. That is why Congress crafted a narrow exception only for clear requirements that could be complied with (or knowingly violated) in real time—not for "general tort theories that happened to have been codified." *Id.* To ascribe a contrary meaning to the predicate exception would produce absurd results, as it not only would make the PLCAA trivially easy to evade, but would make preemption of virtually identical suits grounded in virtually identical departures from traditional legal principles turn on whether and how a state has codified those newfangled theories.

That result would defy "Congress' intention to create national uniformity."  *Id.*  Simply put, any reading of the predicate exception that would allow states to sneak in through the back door the very claims Congress tossed out the front would put the PLCAA at war with itself.

**B.    At a Minimum, HB947 Is Preempted to the Extent It Requires Neither Knowing Violations nor Proximate Cause.**

Even assuming that HB947 qualified as "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii); *but see* Part I.A., *supra*, that alone would not be enough to rescue HB947 from the preemptive force of the PLCAA.  The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*."  15 U.S.C. §7903(5)(A)(iii) (emphases added).  Yet HB947 authorizes actions that do not comply with either of the italicized conditions.

First, HB947 does not require a violation of its "[r]easonable controls" provision to be "knowing."  That provision does not require any *mens rea*; it sets up a strict-liability offense based on any failure to "establish and implement" unenumerated "policies" to achieve sweeping goals regarding the "sale, manufacture, distribution, importation, marketing, possession, and use of . . . firearm-related products."  Md. Code Ann., Cts. & Jud. Proc. §§3-2501(f), 3-2502(b).  Industry members thus can violate HB947 under that amorphous command even if (as will generally be true) they did not *know* that their "policies" were "[un]reasonable."  And lest there be any doubt about what role intent has to play in HB947's enforcement, the statute makes clear that the answer is none:  "A party seeking relief under this section is not required to prove that a firearm industry member acted with the intent to violate this subtitle."  *Id.* §3-2503(b).

Those are no minor deviations.  The predicate exception makes a defendant's "knowing[]" state of mind an essential element for a reason.  15 U.S.C. §7903(5)(A)(iii).  To be sure, Congress

11

did not give industry participants blanket immunity to violate the law or to preempt all state efforts to regulate them. But Congress did very much want to ensure that those engaged in "the *lawful* design, manufacture, marketing, distribution, . . . or sale . . . of firearms or ammunition products" could *not* be held "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* §7901(a)(5) (emphasis added). And one of the central features of the suits that led to the PLCAA was that they sought to make industry members pay to redress the criminal acts of third parties based on generic theories of "unreasonable" practices, even if the industry members had fully complied with all of the many rules and regulations that govern the manufacture and sale of firearms. *See, e.g.*, *City of New York*, 524 F.3d at 399, 403. By exempting only laws that impose liability only if a defendant "knowingly" violates them, Congress ensured that the predicate exception would not enable states to evade the PLCAA's core command by sneaking the same sweeping unreasonableness theories into their statutes. Yet that is exactly what Maryland has tried to accomplish via HB947.

Making matters worse, HB947 does not require proximate causation in the ordinary sense. The predicate exception requires the conduct that violates the underlying statute to *be* "a proximate cause of the harm" for which redress is sought. 15 U.S.C. §7903(5)(A)(iii). Maryland tried to write around that command by simply declaring that remote sales and marketing practices, perhaps decades and thousands of miles removed from the ultimate harm, shall be *deemed* "a public nuisance," regardless of the intervening criminal causes. Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(c); *see id.* §3-2501(f)(1). But by requiring "proximate cause," Congress plainly did not leave it to states to make up their own novel definitions of proximate cause. It meant "to incorporate the well-settled meaning of the common-law term[] it use[d]." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 210-11 (2019). And, under the common law, not only is "foreseeability alone [] not

12

sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), but there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Yet HB947 explicitly discards any such inquiry. While the common law in Maryland (and elsewhere) generally treats criminal misconduct as an intervening cause that *defeats* proximate cause for events occurring earlier in the causal chain, *see, e.g.*, *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 642 A.2d 219, 231-32 (Md. 1994), HB947 expressly inverts the common-law rule that Congress incorporated into the PLCAA. Again, Maryland's recent lawsuit against Glock is a prime example: The Attorney General seeks to hold Glock liable for downstream harm caused by the criminal conversion and criminal misuse of legal Glock pistols (that citizens to this day can lawfully purchase and possess in Maryland). *Glock* Compl. ¶¶9, 59, 95-99. By deploying a novel variant of "proximate cause" that is explicitly designed to facilitate the very thing the PLCAA forbids—*i.e.*, holding industry members responsible for criminals' misuse of their products, and making them pay to redress criminals' misconduct—HB947 once again contravenes the PLCAA.

###    C.    HB947 Violates the Commerce Clause.

1.    Firearm industry members may be held liable under HB947 for their out-of-state conduct, even if they never manufacture, market, or sell anything in Maryland and even if everything they did was perfectly lawful where they did it. That is the definition of directly regulating out-of-state conduct. And that is unconstitutional.

As an initial matter, HB947 is not limited to defendants that conduct business in the state. HB947 defines "Firearm industry member" to "mean[] a person engaged in the sale, manufacture, distribution, importation, or marketing of a firearm-related product." Md. Code Ann., Cts. & Jud. Proc. §3-2501(c). None of that conduct—*i.e.*, the conduct that violates the statute—needs to take place in Maryland for an industry member to come within HB947's terms. To be sure, the

definition of "Firearm-related product"—which is used in both of HB947's substantive provisions in §3-2502—is limited to a product "that is . . . [s]old, manufactured, distributed, or marketed in the State" (or "[i]ntended to be"). *Id.* §3-2501(d). But HB947 does not regulate products; it regulates conduct. And nothing in the statute requires *the defendant being sued* to be the one whose conduct took place in Maryland. Put differently, all of a firearm manufacturer's "sale[s], manufactur[ing], . . . [and] marketing" are fair game for liability under HB947, *no matter where that conduct occurs*, anytime any of the manufacturer's products "is . . . [s]old" in Maryland, even if it is sold by someone else. *Id.* §§3-2501(d), 3-2502(a)-(b).

This is clear in the text and structure of the statute—and, indeed, is the whole point. Start with §3-2502(a). Under that provision, an out-of-state firearm manufacturer can be held liable, and made to pay various forms of monetary recompense to the state, *see id.* §3-2503(a)(2), if a Maryland court finds that the manufacturer's out-of-state "manufacture . . . of [its] firearm[s]" was "[u]nreasonable" and "contribute[d] to harm to the public." So, for instance, the Attorney General could sue a Pennsylvania-based industry member for the lawful sale *in Pennsylvania* of firearms that are legal there but illegal in Maryland, on the theory that it is responsible for any harms caused by persons who purchase those firearms *in Pennsylvania* and bring them into Maryland and use them to commit crimes in Maryland. Indeed, New Jersey has already deployed its analogous statute in exactly that manner. *See* Amended Complaint, *Platkin v. Patriot Enters. Worldwide LLC*, No. MER-C-000093-23 (N.J. Super. Ct. Ch. Div. Dec. 14, 2023) (suing two industry members for lawfully selling firearm kits in Pennsylvania that are unlawful in New Jersey and seeking to hold them responsible for criminal misuse of such kits in New Jersey). Even if the firearms were fully "[]lawful" where they were manufactured, *see* Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)(1), and even if the manufacturer complied with all of the many federal, state, and local regulations

14

governing the manufacture of firearms, the manufacturer could still be sued under HB947 if *someone else* misuses one of its firearms in Maryland.

Section 3-2502(b) is, if anything, even more problematic.  That provision requires firearm industry members to "establish and implement reasonable controls" "that are designed," among other things, to "prevent the loss or theft of [their] product[s] from [their] facilities."  *Id.* §§3-2501(f)(2), 3-2502(b).  Under that provision, a manufacturer could be sued even if all of its manufacturing takes place in Ohio and all of its sales are made to distributors in the Midwest, if *anyone* sells even one of its products in Maryland.  *See id.* §3-2501(d).  And that is not even the half of it.  Imagine that a gang member in Texas breaks into a retailer in Houston and steals a 20-round magazine.  If the thief later moves to Baltimore and brings the magazine with him, the retailer in Houston, Texas, could be sued under HB947 on the theory that it failed to "implement" sufficiently "reasonable procedures" *in Texas* to "prevent the . . . theft of a firearm-related product from a firearm industry member" *in Texas*.  Sellers, no less than manufacturers, are on the hook for all of their business practices (even if they are fully compliant with all regulations), no matter where they are, anytime they are even one link in a long chain that leads to gun crime in Maryland.

In short, HB947 allows Maryland to impose liability on out-of-state industry members even when they do not manufacture, market, or sell any product in Maryland, or even intend for their products to wind up in the state.  As long as one of the industry member's products ends up being used to cause some sort of harm in Maryland and a judge or jury  thinks the industry member could have done more to prevent that outcome, the industry member faces the prospect of crushing liability, including having its out-of-state conduct enjoined, even if that conduct remains lawful where it occurs.  Making matters worse, HB947 authorizes Maryland courts to issue "[i]njunctive relief" to *compel* industry members to implement practices that Maryland deems reasonable, even

15

if all of the places the member would put those new practices into effect would be out of state, and even if all of its original conduct was lawful where it occurred.  *See id.* §3-2503(a)(2)(i).

None of that is constitutional.  The Supreme Court and the Fourth Circuit have long and consistently held that the Commerce Clause, U.S. Const. art. I, §8, cl. 3, prohibits a state from "'directly regulat[ing]'"—that is, imposing liability based upon—conduct that takes place "'wholly outside the State' and involve[s] individuals 'having no connection with [it].'"  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (italics omitted) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (plurality op.)); *see also Ass'n for Accessible Meds. v. Frosh* ("*AAM*"), 887 F.3d 664, 666 (4th Cir. 2018) (invalidating Maryland law because it "directly regulates . . . transactions that occur outside Maryland").  To the extent HB947 applies to conduct that takes place out of state, it is unconstitutional.  As the Fourth Circuit held in *AAM*, a Maryland law like HB947 that "effectively seeks to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland" violates the Commerce Clause, even if that out-of-state conduct "'has effects within the State.'"  887 F.3d at 671-72.

2.    In addition to prohibiting states from regulating conduct that takes place outside of their borders even when it may have in-state effects, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce."  *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).  HB947 violates that command too.

Whatever Maryland may think of the firearm industry, Congress has recognized that the industry not only is critical to ensuring that law-abiding Americans can exercise their Second Amendment rights, but is a vibrant sector of America's economy.  That is precisely why Congress declared that the type of liability HB947 seeks to impose "invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise

16

system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). And the importance of the firearm industry has only grown since the PLCAA was enacted. In 2023 alone, for instance, the firearm industry generated more than $90 billion in economic activity nationwide. *See* Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic Impact Report* 3 (2024), https://tinyurl.com/4u99pzx6. That translates to quality jobs and considerable tax revenue: The firearm industry helped employ more than 380,000 people—almost all of them outside of Maryland—and generated almost $11 billion in taxes in 2023. *Id.*

HB947 discriminates against that economic activity, which is flourishing elsewhere but languishing in Maryland. *Id.* at 4. And HB947 undoubtedly burdens that interstate activity; indeed, Congress has found that efforts to impose liability on the firearm industry for criminal actions of third parties inflict "an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). HB947 inflicts that burden, moreover, in an effort to impose its own gun policy on the rest of the country. But "a State may not impose economic sanctions . . . with the intent of changing . . . lawful conduct in other States." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 572 (1996). For these reasons, too, HB947 violates the Commerce Clause.

### D.    HB947 Violates the First Amendment.

In addition to regulating the manufacture and sale of firearms, HB947 regulates (and allows courts to enjoin) speech protected by the First Amendment based on vague and unconstitutional standards. HB947 defines "firearm industry member[s]"—the only entities to which it applies—to include those engaged in "marketing." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a). It authorizes liability for contributing to a public nuisance "through . . . marketing." *Id.* And it orders industry members to use "reasonable controls regarding . . . marketing." *Id.* §3-2502(b). That is not remotely consistent with the First Amendment. *See 44 Liquormart, Inc. v. Rhode Island*, 517

U.S. 484, 489 (1996) (marketing is protected speech). Laws that single out speech on the basis of content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91, 799 (2011). HB947 does both of those things. And far from being narrowly tailored or even closely drawn to achieve a compelling government interest, HB947 is radically overbroad in relation to any legitimate objective it may further.

1.      Start with content- and viewpoint-based discrimination. HB947 plainly regulates speech based on its content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). After all, HB947 does not apply to *all* marketing; it applies only to "marketing *of a firearm-related product*." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)-(b) (emphasis added). Indeed, HB947 does not even apply to all speech about firearms—only that of "firearm industry member[s]" engaged in "the sale, manufacture, distribution, importation, or marketing of a firearm-related product." *Id.* §3-2502(a). And it fixates on firearm-related speech by firearm-related actors for a reason: Their speech is uniquely likely to communicate a viewpoint the state disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

The topics and views Maryland has singled out in HB947 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. at 791. To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980). But HB947 does not purport to target speech that is false or misleading. It authorizes the imposition of liability for speech about a product—one expressly protected by the Constitution, no less—*even when that speech is truthful*. Tellingly, the words "false," "misleading," and "deceptive" appear nowhere in the statute. A manufacturer that publishes advertisements containing entirely accurate specifications of its lawful products—

ammunition size, magazine capacity, weight, retail price, etc.—could still be liable under HB947 if its advertisements were later deemed to (somehow) have contributed to undefined public "harm," Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), as could an industry member who fails to establish "reasonable controls" with respect to its marketing materials—again, no matter how accurate its advertisements are, *id.* §3-2502(b). Or a retailer that did no more than simply put a sign up in its storefront window informing potential customers that it sells Glock handguns could be held liable for "contributing" to the harms caused by criminals who illegally convert those legal (and popular) handguns into machineguns. *See generally Glock* Compl.

None of that is consistent with the First Amendment. To be sure, firearms are dangerous and can be misused. But that does not entitle speech about firearms to any less constitutional protection. Truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (plurality op.) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion). The mere fact that a product is dangerous does not transform promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed. And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

HB947 thus strikes at the heart of the First Amendment, which furnishes no less protection for truthful commercial speech than it furnishes for other kinds of speech. After all, "bans that target truthful, non-misleading commercial messages rarely protect consumers from [the] harms" that may justify greater regulation of commercial speech. *44 Liquormart*, 517 U.S. at 502-03; *see also, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 494 (1995) (Stevens, J., concurring in the

judgment) ("[A]ny description of commercial speech that is intended to identify the category of speech entitled to less First Amendment protection should relate to the reasons for permitting broader regulation: namely, commercial speech's potential to mislead."). And states may not "underestimate the value" of speech just because it is commercial. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419-24 (1993); *see also Sorrell*, 564 U.S. at 566.

2.      That all means Maryland must prove that HB947 satisfies heightened scrutiny. Indeed, given the speaker, viewpoint, and content discrimination inherent in the statute, strict scrutiny should apply. *See Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 139 (3d Cir. 2020) ("[M]ore than intermediate scrutiny" is required for commercial speech restrictions that single out "some messages or some speakers based on the content of the speech or the identity of the speaker."). But no matter which version of heightened scrutiny applies, the state must prove that HB947 is "narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021). And when a law pursues the government's purported aims "by means that are" both "seriously underinclusive" and "seriously overinclusive," that "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802, 805.

Just so here. For one thing, HB947 is "wildly underinclusive." *Id.* at 801-02. While it is ostensibly motivated by a desire to reduce gun violence, HB947 does *nothing* to police the conduct of criminals who misuse firearms to perpetrate such violence and endanger public health and safety. Nor does it regulate vast swaths of speech—*e.g.*, action and horror films, violent video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence. The statute is thus wildly underinclusive even vis-à-vis the regulation of speech. *Brown*, 564 U.S. at 801-02.

20

HB947 is "vastly overinclusive" as well, *id.* at 804, as it imposes sweeping liability for *any* firearms-related marketing that could later be thought to "contribute to a public nuisance" in Maryland, even if it is nothing more than entirely truthful, non-misleading speech.  Indeed, HB947's scope is breathtaking:  In conceivably any case of gun violence, countless firearm industry members—perhaps thousands of miles away from Maryland and decades before anyone suffers injury—will have engaged in truthful advertising of their firearm products.  Any such advertisements later deemed to have indirectly *contributed* to firearm-related problems in Maryland, even without the industry member's knowledge, could be grounds for liability for someone else's criminal misuse of their products.  To be grounds for liability under HB947, the marketing does not even have to have led to the purchase of the firearm used to perpetrate crimes. In short, HB947 "prohibit[s] or chill[s]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973).

3.    In its effort to sweep up far more protected speech than could conceivably be necessary to accomplish any permissible state objectives, HB947 also suffers from a fatal vagueness problem.  Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).

HB947 does precisely the opposite.  Indeed, the statute makes it impossible for regulated parties to tell what speech is and is not permitted, leaving them with no choice but to err on the

side of refraining from exercising their First Amendment rights.  By its terms, HB947 renders unlawful any marketing that could be said to have "knowingly . . . contribute[d] to harm to the public," Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), and it fails to define what "harm to the public" might entail.  HB947 thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such incomprehensible and undefined abstractions do not articulate *at all*—let alone with "narrow specificity"—what kind of speech may be deemed to have contributed to a "public nuisance."  *Any* advertisement for a lawful product *anywhere* can be grounds for liability if it is later deemed by a Maryland factfinder to have indirectly *contributed* to firearm-related problems in Maryland.  By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule—particularly given that HB947 also contemplates full compliance with state and federal laws relating to marketing of firearms.  *See* Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)(1).  HB947's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech (and the exercise of Second Amendment rights in the process).

That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute.  *Reno*, 521 U.S. at 871-72.  HB947 threatens liability for any marketing that state actors could later say was not subject to reasonable controls.  But under our constitutional framework, the state does not get decide, after the fact, whether speech was reasonable.  Unless commercial speech is false or inconsistent with traditional, clear, and *ex ante* restrictions on speech, the First Amendment fully protects it, even if others might deem the speech "unreasonable."  And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances

22

constitute an exercise of freedom of speech." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). That inherent vagueness dooms HB947 under the First Amendment as well.

On top of all that, even when speech about a product is actually false or misleading, the traditional principles that govern judicial actions for misrepresentations, including proof of reliance, have always required a substantial link between the speech and the claimed injury. *See, e.g.*, *Restatement (Second) of Torts* §525 (Oct. 2024 Update). That link is essential to ensure that efforts to impose liability based on speech are consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate that it caused them any injury, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet HB947 does not even require proof of reliance. Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under HB947, an industry member's speech is deemed to be a "public nuisance" if it violates the terms of the statute regardless of the intervening causes that may have ultimately caused the public harm at issue. *See* Md. Code Ann., Cts. & Jud. Proc. §3-2502(c). The First Amendment demands far more, particularly of content- and speaker-based restrictions on speech. *See Sorrell*, 564 U.S. at 565-66.

### E.    HB947 Is Void for Vagueness.

For many of the reasons that HB947 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices. One of the few things that *is* clear about the statute is that it leaves industry members with no meaningful guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without running afoul of the statute.

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty,

or property, without due process of law." U.S. Const. amend. XIV, §1. A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning . . . violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926). The same is true of a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

For reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961). But it is not just First Amendment concerns that demand regulation with especial precision. A more "stringent" vagueness test applies for statutes that "threaten[] to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The most protective vagueness standard known to our law thus applies here several times over. HB947 not only regulates speech protected by the First Amendment, but also restricts the conduct of those engaged in the lawful business of selling products protected by the Second Amendment to law-abiding citizens who are constitutionally entitled to possess them. The liability HB947 threatens is no small matter—"[i]njunctive relief;" "[r]estitution;" "[c]ompensatory and punitive damages;" "[r]easonable attorney's fees and costs;" and "[a]ny other appropriate relief." Md. Code Ann., Cts. & Jud. Proc. §3-2503(a)(2). HB947 thereby brings with it the "possibility of imposing liability on an entire industry," which "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms. 15 U.S.C. §7901(a)(6). As a result, HB947 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

HB947 flunks that test, as its prohibitions are hopelessly vague. The statute renders it

unlawful to, *inter alia,* "contribute to harm to the public through the sale, manufacture, distribution, importation, or marketing of a firearm-related product by engaging in conduct that is" either "[u]nlawful" or "*[u]nreasonable under the totality of the circumstances*."  Md. Code Ann., Cts. & Jud. Proc. §3-2502(a) (emphasis added).  The text thus confirms that, to fall into the disjunctive "unreasonable" bucket, conduct must be lawful.  Moreover, "the totality of the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has engaged in "the sale, manufacture, distribution, importation, or marketing of a firearm-related product." *Id.*  There is thus no way to know *ex ante*—when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed unreasonable under "the totality of the circumstances."

  And that is not the worst of it.  Even if an industry member could somehow conceive of all relevant circumstances yet to come, it remains a mystery what "[r]easonable controls" means— especially since the term is defined to mean something more than simply complying with the law. *Id.* §3-2501(f).  And the statute's modest effort to supply a definition only makes matters worse: Rather than detail a firearm industry member's concrete obligations with specificity, HB947 commands them to adopt any and all procedures "designed . . . [t]o" prevent or ensure a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *Id.*  What is more, rather than invoke pre-existing common-law nuisance principles, HB947 tasks industry members with predicting abstractions like what "harm to the public" even entails.  That is classic unconstitutional vagueness.

  To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306

(2008). The problem is not mere imprecision at the margins, but the failure to articulate any cognizable standard. Determining, *e.g.*, what promotes (or disserves) the public convenience invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* HB947 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). That would be problematic in any context. When two constitutional rights are at stake, such pervasive vagueness is anathema to the Constitution.

### F.    HB947 Violates the Second Amendment.

Imposing novel liability for lawful commerce in firearms violates the Second Amendment. There is no question that HB947 burdens Second Amendment activity by singling out the act of manufacturing and selling constitutionally protected arms for the imposition of potentially massive liability. The question is thus whether the state can prove that the burdens HB947 imposes are consistent with "this Nation's historical tradition" of regulating commerce in firearms. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022); *United States v. Rahimi*, 602 U.S. 680, 689 (2024). The answer is no. As Congress explained in the PLCAA, efforts to hold those engaged in the lawful commerce of firearms liable for the criminal misuse of their products by third parties are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7). Indeed, even the few courts that accepted such theories before Congress enacted the PLCAA did not do so until the turn of the twenty-first century. Simply put, the novel liability HB947 invites lacks any historical pedigree at all, and violates the Second Amendment.

## II.    The Remaining Factors All Favor Injunctive Relief.

1.     The constitutional injuries HB947 is inflicting on NSSF and its members are sufficient irreparable injury in and of themselves to justify injunctive relief, especially given the significant chilling effect HB947 has on constitutionally protected speech. *See, e.g., Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). But they certainly do not stand alone.

First, the process of trying to ascertain what the vague terms of HB947 mean and what steps, if any, industry could try to take today to avoid being deemed to have acted unreasonably tomorrow will be considerable—and, thanks to the Eleventh Amendment, unrecoverable. *See Miller*, 637 F.3d at 302. That is an irreparable and immediate injury. *See id.*[1] And industry cannot delay in considering steps to limit future liability. HB947 allows the Attorney General to bring a civil action for practically any kind of relief if he suspects a violation of the statute. *See* Md. Code Ann., Cts. & Jud. Proc. §3-2503(a). And all indications are that he intends to use that authority— a reality that Maryland's recent Glock suit lays bare. *See, e.g.*, *Glock* Compl. ¶¶1-16, 59, 95-99.

Indeed, that lawsuit itself makes further targeting of NSSF members all but inevitable, as several members sell, distribute, and market the very Glock pistols that the Maryland Attorney General has sought to ban through its lawsuit against Glock.[2] Some members also manufacture, sell, distribute, and market pistols inspired by Glock's design, as well as AR-15 style firearms, both of which can also be illegally converted into machineguns.[3] Still other members manufacture, sell, distribute, and market in neighboring states firearms and magazines that are banned in

---

[1] *See also* Cargill Decl. ¶¶14-20 (attached here as Exhibit 1); Daniel Decl. ¶¶15-21 (attached here as Exhibit 2); Emonet Decl. ¶¶16-21 (attached here as Exhibit 3); Treadway Decl. ¶¶16-21 (attached here as Exhibit 4); Liptak Decl. ¶¶16-21 (attached here as Exhibit 5); Tyree Decl. ¶¶16-21 (attached here as Exhibit 6); Cupero Decl. ¶¶16-21 (attached here as Exhibit 7); Glaser Decl. ¶¶14-20 (attached here as Exhibit 8); Dickson Decl. ¶¶15-20 (attached here as Exhibit 9); Sprague Decl. ¶¶14-19 (attached here as Exhibit 10); Vorhees Decl. ¶¶16-21 (attached here as Exhibit 11); Spafford Decl. ¶¶14-19 (attached here as Exhibit 12); Reid Decl. ¶¶15-21 (attached here as Exhibit 13); Tuason Decl. ¶¶16-21 (attached here as Exhibit 14); Farris Decl. ¶¶18, 22-26, 28 (attached here as Exhibit 15).

[2] *See* Cargill Decl. ¶23; Emonet Decl. ¶24; Treadway Decl. ¶25; Liptak Decl. ¶25; Tyree Decl. ¶25; Glaser Decl. ¶23; Dickson Decl. ¶24; Sprague Decl. ¶23; Spafford Decl. ¶23.

[3] *See* Griffith Decl. ¶¶11-20 (attached here as Exhibit 16); McNamara Decl. ¶13 (attached here as Exhibit 17); Tuason Decl. ¶25; Farris Decl. ¶¶20-21; Treadway Decl. ¶26; Vorhees Decl. ¶¶25-26; Cargill Decl. ¶24; Daniel Decl. ¶24; Emonet Decl. ¶26; Liptak Decl. ¶26; Tyree Decl. ¶26; Cupero Decl. ¶25; Glaser Decl. ¶24; Dickson Decl. ¶25; Sprague Decl. ¶24; Spafford Decl. ¶24; Reid Decl. ¶24.

Maryland, creating a serious risk that they will be haled into court if anyone unlawfully brings those firearms magazines into New Jersey and uses them to commit a crime there.[4]  Members could guard against the risk of such lawsuits only by ceasing to sell, distribute, or market these lawful products altogether—at substantial loss to their businesses.[5]  And there may not even be a feasible way to guard against some of the risks that HB947 imposes.  For example,  after hearing of the lawsuit the attorney general of New Jersey filed against a retailer for failing to confirm that purchasers of magazines and rifle ammunition are not prohibited from possessing firearms (which neither federal nor New Jersey law requires), *see Point Blank* Complaint, *supra*, one Maryland-based NSSF member explored whether it would be possible to secure background checks for magazine and ammunition sales and learned that the FBI's background check system will not allow it.  *See* Spafford Decl. ¶¶26-28; *see also* 18 U.S.C. §922(a)(5); 27 C.F.R. §478.102(a); James B. Jacobs & Zoe A. Fuhr, *Universal Background Checking—New York's Safe Act*, 79 Alb. L. Rev. 1327, 1349 (2016) ("[F]ederal law does not permit NICS to be used for ammunition purchase[s].").

Second, the text of the PLCAA could not be clearer that the lawsuits HB947 authorizes "may not be brought in any Federal or State court."   15 U.S.C. §7902(a).  That unequivocal language is not just a defense against liability; it is "an explicit statutory . . . guarantee that trial will not occur."  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989).  It is no wonder, then, that courts across the country have consistently interpreted the statute as creating not just a shield from liability, but an immunity from suit entirely.  *See, e.g.*, *In re Acad., Ltd.*, 625 S.W.3d 19, 32-36 (Tex. 2021); *KS&E Sports v. Runnels*, 72 N.E.3d 892, 904-05 (Ind. 2017); *Sambrano v.*

---

[4] *See* Liptak Decl. ¶27; Cargill Decl. ¶¶24-25; Daniel Decl. ¶24; Emonet Decl. ¶27; Tyree Decl. ¶27; Glaser Decl. ¶25; Dickson Decl. ¶26.

[5] *See* Cargill Decl. ¶¶20, 25; Daniel Decl. ¶21; Emonet Decl. ¶22; Treadway Decl. ¶22; Liptak Decl. ¶22; Tyree Decl. ¶22; Cupero Decl. ¶22; Glaser Decl. ¶21; Dickson Decl. ¶21; Sprague Decl. ¶20; Vorhees Decl. ¶22; Spafford Decl. ¶20; Reid Decl. ¶21; Tuason Decl. ¶22.

*Savage Arms, Inc.*, 338 P.3d 103, 104 (N.M. Ct. App. 2014). No court can make NSSF's members whole for having to defend against suits that should never have been brought in the first place—particularly when they are brought by the state, which would be immune from any later suit to recoup monetary losses. *See Fernández-Vargas v. Pfizer*, 522 F.3d 55, 68-69 (1st Cir. 2008) (approving injunction because loss of immunity from suit "would constitute irreparable harm").

Indeed, advocates behind the suits brought before the PLCAA was passed—and those behind statutory efforts like HB947—have been frank about their aims. Win or lose, they seek to "unleash the plaintiffs' lawyers and attorneys general against the firearm industry" to "critically weaken" it. Ramsin Canon, *Instead of Criminalizing Individuals, Let's Take Down the Gun Industry*, Truthout (Aug. 9, 2019), https://bit.ly/33pUk8r. The actions HB947 invites could cripple the firearm industry regardless of whether they ultimately succeed.

Make no mistake, though; both public and private plaintiffs in these kinds of actions *have* sought millions and even billions of dollars and will undoubtedly do the same here if HB947 is not enjoined. While some NSSF members may be able to withstand a litigation firestorm, many others will not be. *See* Steven Spearie, *Gun Dealer: New Illinois Law Will 'Put a Hammer' On Us*, State J.-Reg. (July 22, 2019), https://tinyurl.com/2mtm3kxr (noting that changes in Illinois law shuttered half of the state's gun dealers). Indeed, one licensed retailer recently acceded to violating New Jersey's "reasonable controls" provision based solely on not confirming that purchasers of rifle ammunition are not prohibited from possessing firearms—which, as noted, neither state nor federal law requires. *See* Consent Order and Final Judgment, *Point Blank*, *supra* (N.J. Super. Ct. Ch. Div. Mar. 13, 2025). The economic and reputational harm HB947 promises is thus irreparable, as it threatens at best "the loss of valuable business opportunities" and at worst the very existence of NSSF member businesses. *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th

Cir. 2002); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).[6]

      2.      Plaintiff's showing on the "[t]he first two" and "most critical" factors—likelihood of success and irreparable harm—suffices to justify a preliminary injunction.  *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). But the public interest favors an injunction as well.  HB947 encroaches on federal authority by flouting Congress' express purposes in passing the PLCAA.  *See, e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (public interest favored injunction where state law conflicted with "Congress' policy choice, articulated in a statute"); *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F.Supp.3d 379, 397 (D. Md. 2022) ("The State and the public have no legitimate interest in the operation of a state law that is likely preempted by federal law."). HB947 also foments interstate conflict and burdens interstate commerce by setting Maryland up as the judge of lawful business practices in other states.  *See, e.g.*, *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 795 (4th Cir. 1991) (public interest favored injunction where state law burdened interstate commerce).  And it tramples on individual rights—the right to keep and bear arms, the freedom of speech, the privilege of pursuing a common calling, and more. *See, e.g.*, *Miller*, 637 F.3d at 302 (public interest clearly favored injunction where law burdened constitutional rights of Marylanders).  The public interest does not favor in the slightest keeping in place a statute that poses such a grave threat to fundamental constitutional rights.

## CONCLUSION

      For the reasons set forth above, this Court should grant a preliminary injunction.

---

[6] *See also* Cargill Decl. ¶26; Daniel Decl. ¶25; Emonet Decl. ¶28; Treadway Decl. ¶27; Liptak Decl. ¶28; Tyree Decl. ¶28; Cupero Decl. ¶26; Glaser Decl. ¶26; Dickson Decl. ¶27; Sprague Decl. ¶26; Vorhees Decl. ¶27; Spafford Decl. ¶¶28-29; Reid Decl. ¶¶22-25; Tuason Decl. ¶26.

Respectfully submitted,

s/James W. Porter III
JAMES W. PORTER III (BAR NO. 19416)
JOHN PARKER SWEENEY (BAR NO. 08761)
BRADLEY ARANT BOULT CUMMINGS, LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
(202) 719-8232
jporter@bradley.com

PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
NICHOLAS A. AQUART**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* *Pro hac vice* application forthcoming.

** Supervised by principals of the firm who are members of the Virginia Bar; *pro hac vice* application forthcoming.

*Counsel for Plaintiff*

April 3, 2025

31

**INDEX OF EXHIBITS**

| Exhibit Number | Exhibit Title | Related Pages |
|---|---|---|
| 1 | Declaration of Michael Cargill on behalf of CTCHGC, LLC d/b/a Central Texas Gun Works | 27, 28, 30 |
| 2 | Declaration of Marty Daniel on behalf of Daniel Defense, LLC | 27, 28, 30 |
| 3 | Declaration of Mark Emonet on behalf of Lipsey's LLC | 27, 28, 30 |
| 4 | Declaration of Nate Treadway on behalf of Vigilant Gear, LLC d/b/a Lone Wolf | 27, 28, 30 |
| 5 | Declaration of Duane Liptak on behalf of Magpul Industries Corp. | 27, 28, 30 |
| 6 | Declaration of Arielle Tyree on behalf of RSR Group, Inc. | 27, 28, 30 |
| 7 | Declaration of Susan Cupero on behalf of Smith & Wesson Brands, Inc. | 27, 28, 30 |
| 8 | Declaration of Melissa Glaser on behalf of Shedhorn Sports, Inc. | 27, 28, 30 |
| 9 | Declaration of Tripper Dickson on behalf of Sports South, LLC | 27, 28, 30 |
| 10 | Declaration of Richard Sprague on behalf of Sprague's Sports, LLC | 27, 28, 30 |
| 11 | Declaration of Brett Vorhees on behalf of Taurus International Manufacturing, Inc. | 27, 28, 30 |
| 12 | Declaration of Charles Spafford on behalf of Tyler Firearms, LLC | 27, 28, 30 |
| 13 | Declaration of Kevin B. Reid on behalf of Sturm, Ruger & Company, Inc. | 27, 28, 30 |
| 14 | Declaration of Martin Tuason on behalf of Armscor Global Defense, Inc. and Armscor Precision International | 27, 28, 30 |
| 15 | Declaration of Allen Farris on behalf of Matrix Arms | 27 |
| 16 | Declaration of Earl Griffith | 27 |
| 17 | Declaration of John McNamara on behalf of the National Shooting Sports Foundation | 27 |

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing shall be served via U.S. Certified Mail

with return receipt requested upon Defendant at the following address:

Anthony G. Brown
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202

                                      Respectfully submitted,

                                      /s/ JAMES W. PORTER III
                                      JAMES W. PORTER III (Bar No. 19416)